IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| nClosures Inc.<br><br>  Plaintiff,<br><br>  v.<br><br>Block and Company, Inc. d/b/a<br>MMF POS and MMF Industries,<br><br>  Defendants. | Case No. 1:12-cv-09358<br><br>PLAINTIFF'S FIRST AMENDED<br>COMPLAINT<br><br><br>Judge: Hon. Samuel Der-Yeghiayan<br>Magistrate Judge: Hon. Jeffrey T. Gilbert |

### FIRST AMENDED COMPLAINT

Tablet enclosures allow retailers to offer use of a tablet within the retailer's place of business without fear of theft of the tablet. This case involves fraud, trade secret misappropriation, breaches of fiduciary and contractual duties, and federal unfair competition arising from defendant's theft of plaintiff's design of state of the art iPad and other tablet enclosures and misuse of plaintiff's "Rhino" marks in interstate commerce. The tablet enclosure market is exploding and defendant's fraud and breaches are irreparably harming plaintiff right now day by day. For example, defendant is gearing up to market its product based on the stolen design at a trade show in New York on January 13, 2013. Plaintiff respectfully seeks a preliminary injunction and money damages.

**Parties**

1. Plaintiff nClosures Inc. ("nClosures") is a Michigan corporation with its principal place of business at 818 Red Drive, Suite 60, Traverse City, MI 49684. nClosures is an industrial design firm that sells, among other things, tablet enclosures.

2. Defendants Block and Company, Inc., MMF Industries, and MMF POS ("Block") are Illinois corporations having a principal place of business at 1111 Wheeling Road, Wheeling, IL 60090.

**Amount in Controversy**

3. nClosures alleges five causes of action below that each independently exceeds $75,000. First, nClosures alleges that Block defrauded nClosures by misrepresenting Block's use of nClosures's designs and other trade secrets. Damages arising from this fraud include the sales and all other ill-gotten gains arising from Block's fraud as well as punitive damages—all of which are well in excess of $75,000. For example, Block saved approximately and no less than $200,000 in leveraging the cost of nClosures's design of its state of the art tablet enclosure.

4. Second, nClosures alleges that Block misappropriated nClosures's trade secrets, including nClosures's confidential tablet enclosure designs and marketing and pricing information. Damages arising from Block's misappropriation include the sales and all other ill-gotten gains arising from Block's misappropriation as well as punitive damages—all of which are well in excess of $75,000. For example, Block's misappropriation of trade secrets caused nClosures to lose profits that exceed $75,000.

5. Third, nClosures alleges that Block breached its fiduciary duty to nClosures arising from the parties' partnership. The damages arising from this breach include the sales and all other ill-gotten gains arising from Block's breach as well as punitive damages—all of which are well in excess of $75,000. For example, Block saved no less than $75,000 in leveraging the cost of nClosures's knowledge of the tablet enclosure market—including competitors and industry sectors.

6. Fourth, nClosures alleges that Block breached its contractual duty to forgo use of nClosures's confidential information for Block's own benefit. The damages arising from this breach include the sales and all other ill-gotten gains arising from Block's breach as well as unpaid royalty income—all of which are well in excess of $75,000. Indeed, Block owes nClosures a lump sum royalty payment of $100,000.

7. Fifth, nClosures alleges that Block's use of the mark "Rhino" in interstate commerce to advertise, market, and sell tablet enclosures constitutes unfair competition in violation of 15 U.S.C. § 1125(a). The damages arising from this conduct include great and irreparable damage to nClosures's business, goodwill, reputation, profits, and the strength of the "Rhino" marks—all of which are well in excess of $75,000.

**Jurisdiction and Venue**

8. This action arises under the federal trademark statute (the "Lanham Act"), 15 U.S.C. § 1051 et seq., and under the laws of the State of Illinois.

9. This Court has subject matter jurisdiction over the federal unfair competition claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331. The Court has subject matter jurisdiction over the related Illinois state law claims pursuant to 28 U.S.C. §§ 1367.

10. This is also a diversity case. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. Complete diversity exists because nClosures is a citizen of Michigan and Block is a citizen of Illinois. And, as set forth above, the matter in controversy exceeds $75,000.

11. Block is subject to personal jurisdiction in accordance with Illinois's long-arm statute, 735 ILCS § 5/2-209(b)(3).

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

**General Allegations**

13. Daniel McKean and Daniel Gorman founded nClosures in 2011. During mid to late 2010, Gorman designed the first iterations of the tablet enclosures and accessories that nClosures sells today. On or about May 15, 2011, nClosures began to sell the Rhino iPad enclosure. As of May 23, 2011, nClosures had invested at least approximately $300,000 in developing confidential information, including its product designs, assembly drawings, and compilations of market, competitor, pricing, and customer information.

14. On May 23, 2011, the CEO of Block, Greg Carlson, approached McKean and Gorman at the National Restaurant Association tradeshow in Chicago, Illinois. Carlson stated to McKean and Gorman that Block desired to enter the tablet enclosure market. Carlson stated that Block could not enter this market as soon as Block desired without a partner who had completed designs, design engineering capacity, and knowledge of the tablet enclosure market (e.g., pricing and distribution channels). Carlson proposed to McKean and Gorman that Block and nClosures explore whether nClosures and Block should partner in entering the tablet market together—nClosures contributing its designs and market knowledge and Block contributing its manufacturing capability and distribution channel.

15. On May 24, 2011, nClosures and Block executed the Confidentiality and Non-Disclosure Covenant (the "Confidentiality Agreement") (attached hereto as Exhibit A). The Confidentiality Agreement states, "Block and nClosures have begun and expect to continue to pursue discussions (the "Discussions") relative to a potential business

4

relationship with respect to iPad Enclosures (the "Objective") . . . ." (Confidentiality Agreement at 1.) Through the Confidentiality Agreement, Block promised to only use nClosures's designs and market knowledge "solely for the purposes of engaging in the Discussions and evaluating the Objective . . . ." (*Id*.) "Each Party agrees to indemnify, defend and hold harmless the other Party from any damages, costs, liabilities or expenses (including reasonable attorneys' fees) arising from, or relating to, any breach by the breaching Party, or its Agents of the obligations herein." (*Id*. ¶ 9.)

16. "The Parties further acknowledge and agree that the unauthorized disclosure or use of Confidential Information or any other breach by the Receiving Party, or its Agents, of the obligations hereunder will result in irreparable injury to the Disclosing Party and shall entitle the Disclosing Party to receive injunctive relief in any legal proceeding instituted by the Disclosing Party." (*Id*.)

17. Pursuant to the Confidentiality Agreement, nClosures provided Block with nClosures's trade secrets, including nClosures's designs, market knowledge, and manufacturing set up. nClosures provided Block solid models and assembly drawings. nClosures provided Block market knowledge in the form of tablet enclosure competitor information and industry sector information. nClosures provided Block with nClosures's knowledge of how to set up tablet enclosure manufacturing operations.

18. Block took these trade secrets and developed a tablet enclosure—Atrio. Contrary to Block's statements on which nClosures relied, however, from May 2011 through August 2012, Block practiced a pattern of misstatements to leverage nClosures's design and market knowledge to develop Atrio while also taking all of the benefits of Atrio for Block.

19. On October 26, 2011, Block committed $1 million in equipment that today is used to manufacture the Atrio product. At this time, Block stated to nClosures that nClosures would share in the benefits of this new product: "We've [sic] very excited to be moving forward with all this, our *partnership* and all the new product opportunities and new business development it will lead to…very quickly!" (emphasis added). This statement was false then and is now. Block has not shared any benefits of Atrio with nClosures notwithstanding nClosures's contribution of the design and market knowledge that made Atrio possible.

20. On March 13, 2012, Block shared a prototype of Atrio in order to extract more design and market knowledge from nClosures. "In making our $1M investment in equipment, we must accelerate our internal produced offering and significantly increase our go to market presence in order to get payback on our investments, establish a beach head and grow our market share substantially in this growing market." The Rhino design and the Atrio prototype are nearly identical:




Atrio          Rhino Elite POS

21. On March 14, 2012, Block admitted that the Atrio is "[a]ll based on current Rhino design." That same day, Block stated, "Want to state and reinforce there is nothing 'going on or planned' on our side to subvert *our partnership*." (emphasis added). This statement was false then and is now. Block has not shared any benefits of Atrio with nClosures notwithstanding nClosures's contribution of the design and market knowledge that made Atrio possible.

22. On April 13, 2012, McKean and Gorman traveled to Block's principal place of business in Wheeling, IL. At this meeting, nClosures and Block confirmed that the two companies were in a "highly collaborative" and transparent relationship. At this meeting, Block acknowledged again that all tablet enclosure designs that had been shared were owned by nClosures and would be further developed by nClosures in the first instance. And at this meeting, nClosures disclosed to Block more market knowledge— including tablet enclosure pricing, industry sectors, and a marketing strategy.

23. On April 19, 2012, Carlson forwarded an email to nClosures celebrating a lucrative tablet enclosure deal: "And so it begins!" Carlson was celebrating a deal with BlueStar and ShopKeep. On information and belief, nothing began for nClosures, as Block has squeezed nClosures out of this deal and now sources this deal with the Atrio product.

24. On April 27, 2012, Carlson sent another email trumpeting the partnership: "Rollin, Rollin, Rollin…keep those Rhino's Rollin…!!!"

25. On May 9, 2012, Block informed nClosures that Block terminated Carlson and that Carlson would remain available in a transitional role for a time. On June 6,

2012, Carlson emailed nClosures and stated that Block would be seeking to renegotiate the benefits running in favor of nClosures for the partnership's tablet enclosure products.

26. On June 28, 2012, David Kaufman of Block stated to nClosures that Block liked nClosures's market knowledge and "will certainly take any advise [sic] and ideas you have."

27. On August 1, 2012, Block launched the Atrio product, which competes with nClosures's products in the tablet enclosure market.

28. On August 13, 2012, Kaufman stated to nClosures "we can't sell at all for you"—meaning that Block was terminating the partnership and would not share any of the benefits of Atrio with nClosures.

29. Block continues to offer tablet enclosures for sale to the public, which it holds out as the "MMF POS Rhino Elite iPad Enclosure," through the websites of various distributors and resellers.

30. Customers have contacted nClosures expressing confusion over which entity is the source of Rhino Elite products—nClosures or Block.

**COUNT 1**
**FRAUD**

31. nClosures incorporates by reference the allegations set forth above.

32. Throughout the course of the parties' relationship, Block continuously made misrepresentations to nClosures that Block was acting in the interest of the partnership, (*see, e.g.,* supra ¶¶ 14, 19-24), and that "there is nothing 'going on or planned' on our side to subvert our partnership," (supra ¶ 21), while in fact Block intended to use nClosures's confidential information for its own benefit and in competition with nClosures.

33. Block knew that these statements were false, but continued to misrepresent the facts in order to induce nClosures to continue to provide its valuable confidential information.

34. nClosures reasonably relied on Block's misrepresentations by continuing to disclose its confidential information to Block. For example, nClosures's reasonable reliance was based on having the Confidentiality Agreement in place and believing that Block would perform its obligations under the Confidentiality Agreement.

35. These misrepresentations were material because absent the misrepresentations, nClosures would not have provided any confidential information to Block, nor would it have continued to do so throughout the course of the parties' relationship; however, nClosures relied on the misrepresentations and disclosed its confidential information to Block.

36. nClosures was damaged by being induced to disclose its confidential information to Block, which used the information to develop and sell its own products in competition with nClosures without sharing any profit from those sales with nClosures.

## COUNT 2
## TRADE SECRET MISAPPROPRIATION

37. nClosures incorporates by reference the allegations set forth above.

38. nClosures's proprietary trade secrets and confidential information, including designs of tablet enclosures, assembly drawings, and compilations of market, competitor, pricing, and customer information, as set forth individually and collectively in the preceding paragraphs of the Complaint, are statutory "trade secrets" protected by the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

39. This information is sufficiently secret to provide both actual and potential economic benefit to nClosures by enabling nClosures to have a significant competitive advantage over its competitors.

40. nClosures has continually taken steps to maintain the secrecy of this information, including the use of non-disclosure agreements and limiting employees' access to the information on a need-to-know basis.

41. Block gained access to nClosures's trade secrets by signing the Confidentiality Agreement and then misappropriated the trade secrets by using the information to develop its Atrio product, which it admitted was based on nClosures's design, (supra ¶ 21), and was an unpermitted use under the Confidentiality Agreement. (Confidentiality Agreement ¶ 2.)

42. nClosures has been and continues to be damaged due to Block's misappropriation of its trade secrets because Block uses the information to manufacture and sell its Atrio product without sharing any profits with nClosures and in competition with nClosures.

43. Block's misappropriation of nClosures's trade secrets was willful and malicious as shown, for example, by its continuous representations that it was acting as a partner, (*see*, *e.g.*, supra ¶¶ 19-24), while in fact it was planning to compete with nClosures, and entitles nClosures to exemplary damages and an award of attorneys' fees and costs pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

44. nClosures also is entitled to injunctive relief to prevent the further misappropriation and use of nClosures's proprietary trade secrets and confidential information by Block pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq.

## COUNT 3
## BREACH OF FIDUCIARY DUTY

45. nClosures incorporates by reference the allegations set forth above.

46. Block owed nClosures a fiduciary duty arising out of the nature of their relationship as business partners to carry on the business of manufacturing and selling tablet enclosures for profit.

47. Block also owed nClosures fiduciary duties from the trust and confidence nClosures placed in Block due to the Confidentiality Agreement and Block's assertions of trustworthiness. (*See* supra ¶¶ 14-15, 19-24.)

48. Among the fiduciary duties Block owed nClosures was the duty to not use the confidential information to profit for its own benefit nor to the detriment of nClosures.
Block breached its fiduciary duty to nClosures by:

    (a) using nClosures's designs, models, assembly drawings, and manufacturing know how to manufacture its Atrio product;

    (b) using nClosures's market knowledge, competitor information, industry analysis, and knowledge of potential customers to sell its Atrio product;

    (c) continually representing to nClosures that all of Block's conduct was in the furtherance of the partnership relationship and to the mutual benefit of both parties, (*see, e.g.*, supra ¶¶ 14, 19-24);

    (d) depriving nClosures from receiving any profit from Block's use of nClosures's confidential information; and

    (e) selling the Atrio product in competition with nClosures.

49. Block's breach of its fiduciary duty proximately caused and continues to cause damage to nClosures by depriving nClosures of all benefits Block received from its breach and by destroying the value of nClosures's confidential information derived from its confidentiality.

## COUNT 4
## BREACH OF CONTRACT

50. nClosures incorporates by reference the allegations set forth above.

51. On May 24, 2011, Block and nClosures executed the legally binding Confidentiality Agreement.

52. Block has materially breached at least paragraph 2 of the Confidentiality Agreement by using nClosure's confidential information for unpermitted purposes, including but not limited to:

(a) using nClosures's designs, models, assembly drawings, and manufacturing know how to manufacture its Atrio product; and

(b) using nClosures's market knowledge, competitor information, industry analysis, and knowledge of potential customers to sell its Atrio product.

53. nClosures would not have provided any confidential information to Block had it known that Block would use the information for unpermitted purposes.

54. nClosures has and continues to perform all of its obligations under the Confidentiality Agreement.

55. nClosures has been and continues to be damaged due to Block's material breach of the Confidentiality Agreement.

## COUNT 5
## FEDERAL UNFAIR COMPETITION

56. nClosures incorporates by reference the allegations set forth above.

57. nClosures has devoted substantial time, effort, and resources to the development and extensive promotion of the "Rhino" marks and the products offered in interstate commerce thereunder. As a result of nClosures's efforts, customers have come to recognize and rely upon the "Rhino" marks as an indication of the high quality associated with nClosures's products.

58. Block is well aware that the "Rhino" is the exclusive design and brand of nClosures, Inc.

59. Block has and continues to offer tablet enclosures for sale to the public, which it holds out as the "MMF POS Rhino Elite iPad Enclosure," through the websites of various distributors and resellers.

60. Block's use of the "Rhino" marks has caused, and will continue to cause, confusion of nClosures's customers as to the origin of nClosures's and Block's products.

61. As the actual and proximate result of Block's use of the "Rhino Elite" mark, nClosures has suffered and will continue to suffer great and irreparable damage to its business, goodwill, reputation, profits, and the strength of its marks; has damaged nClosures's goodwill and reputation of the "Rhino" brand name.

62. The foregoing acts and conduct by Block constitute unfair competition in violation of 15 U.S.C. § 1125(a).

63. The foregoing acts in violation of 15 U.S.C. § 1125(a) have been and continue to be deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

64. nClosures is entitled to a permanent injunction against Defendant, as well as all other remedies available under the Lanham Act, including, but not limited to, compensatory damages; treble damages; disgorgement of profits; and costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, nClosures prays for the following relief against Block:

(a) Judgment that Block has committed fraud against nClosures;

(b) Judgment that Block has misappropriated nClosure's trade secrets;

(c) Judgment that Block has breached its fiduciary duty to nClosures;

(d) Judgment that Block has breached the Confidentiality Agreement;

(e) Judgment that Block's conduct constitutes unfair competition in violation of 15 U.S.C. § 1125(a);

(f) For all damages sustained as a result of Block's conduct;

(g) For punitive damages;

(h) For treble damages pursuant to 15 U.S.C. § 1117;

(i) For pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

(j) For a preliminary injunction enjoining Block, its officers, agents, servants, employees, and all other persons acting in concert or participation with it from further making use of all confidential information shared with Block by nClosures under the Confidentiality Agreement;

(k) For a permanent injunction enjoining Block, its officers, agents, servants, employees, and all other persons acting in concert or participation with it

        from further making use of all confidential information shared with Block by nClosures under the Confidentiality Agreement;

(l)     For an award of attorneys' fees pursuant to the Confidentiality Agreement and 15 U.S.C. § 1117;

(m)     For all costs of suit pursuant to the Confidentiality Agreement and 15 U.S.C. § 1117; and

(n)     For such other and further relief as the Court may deem just and proper.

Date: <u>January 8, 2013</u>                          /s/ Matthew M. Wawrzyn
                                                           Matthew M. Wawrzyn
                                                           Stephen C. Jarvis
                                                           WAWRZYN LLC
                                                           233 S. Wacker Dr., 84th Floor
                                                           Chicago, IL 60606
                                                           (312) 283-8330
                                                           matt@wawrzynlaw.com
                                                           stephen@wawrzynlaw.com

                                                           *Counsel for nClosures Inc.*

**CERTIFICATE OF SERVICE**

I, Matthew M. Wawrzyn, an attorney, hereby certify that I served Block and Company, Inc. with the foregoing by electronically filing it and, thereby, causing it to be sent to counsel of record.

Dated: January 8, 2013

By: s/ Matthew Wawrzyn
Matthew M. Wawrzyn
Stephen C. Jarvis
WAWRZYN LLC
233 South Wacker Drive, 84th Floor
Chicago, Illinois 60606
(312) 283-8330 (phone)
(312) 283-8331 (fax)
matt@wawrzynlaw.com
stephen@wawrzynlaw.com

*Counsel for nClosures, Inc.*